# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| PATSY PAYTON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Civil Action No. 09-S-022-NW** |
| | ) | |
| CITY OF FLORENCE, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Patsy Payton, filed a complaint asserting claims under 42 U.S.C. §
1983 against the City of Florence, Alabama, and two of that City's police officers,
Ricky McCreless and Drew Harless, for unlawful search (count I) and excessive force
(count III).[1]  In addition, plaintiff alleges supplemental state-law claims for trespass
(count II) and "assault and battery/excessive force" (count IV).[2]  The case presently
is before the court on defendants' motion for summary judgment.[3]  For the reasons
set forth herein, the court concludes that the motion is due to be granted.

## I. STANDARD OF REVIEW

---

[1] *See* doc. no. 1 (complaint).  In her response to defendant's motion for summary judgment,
plaintiff agreed to the dismissal of her § 1983 claims against the City of Florence.  *See* doc. no. 32
(plaintiff's response), at 1.  In addition, Patsy Payton's husband, Jerry Payton, was originally named
as a plaintiff, but his claims were voluntarily dismissed.  *See* doc. nos. 18 (motion for voluntary
dismissal) and 19 (order dismissing Jerry Payton's claims).

[2] *See* doc. no. 1.

[3] *See* doc. no. 24.

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[4]  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment."[5]  *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v.*

---

[4] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

[5] This case also involves an audio recording of a portion of the events in the narrative of this case. Significantly though, the audio recording did not begin until *after* the alleged constitutional violations had already occurred.  Consequently, the Supreme Court's direction regarding the weight to be given such evidence has no material impact on the core facts.  However, when plaintiff's allegations differ from such evidence, this court will relate, and rely upon, the objective facts.  *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.");  *Beshers v. Harrison*, 495 F.3d 1260, 1262 n.1 (11th Cir. 2007) (refusing to adopt a plaintiff's version of facts when reviewing a district court's order granting summary judgment in favor of the defendant police officers on the issue of qualified immunity to an excessive force claim because the plaintiff's factual allegations were "clearly contradicted" by videotape evidence, "such that no reasonable jury could believe" the plaintiff's version of facts).

*City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  STATEMENT OF FACTS

Plaintiff, Patsy Payton, and her husband, Jerry Payton, Sr., have resided at 1618 Northern Boulevard in Florence, Alabama since 1970.[6]  On January 8, 2007, the defendant police officers, Ricky McCreless and Drew Harless, entered their dwelling without permission while attempting to execute a warrant for the arrest of Philip

---

[6] *See* doc. no. 26 (defendant's evidentiary submissions), Ex. B (Deposition of Patsy Payton) ("Plaintiff Depo."), at 39-40.

Payton, the adult son of Patsy and Jerry Payton.[7]  Plaintiff's claims arise out of that unauthorized entry and Officer McCreless's contemporaneous use of physical force to restrain plaintiff.

## A.    Preparation of the Arrest Warrant and Related Materials

The arrest warrant relied upon by the officers listed 1618 Northern Boulevard as Philip Payton's address.[8]  The original source for that address was two appearance bonds executed by Philip Payton, under penalty of perjury, on April 7, 2006, the date upon which he was arrested by the Florence Police Department ("FPD") for felony DUI, driving with a suspended license, possession of marijuana, and possession of drug paraphernalia.[9]  That was the last contact Philip had with the FPD.

Although Philip Payton had no personal contact with the FPD between his April 7, 2006 arrest and the January 8, 2007 incident made the basis of this suit, FPD records indicate that an individual who identified herself as "Kandy Payton" called police on September 25, 2006, and stated that Philip was her estranged husband.  She

---

[7] *See* doc. no. 26 (defendant's evidentiary submissions), Ex. G (Deposition of Officer Ricky McCreless) ("McCreless Depo."), at 9-14 and 109;  Ex. H (Deposition of Officer Drew Harless) ("Harless Depo."), at 37-38; Plaintiff Depo. at 20-21 (noting that Philip Payton was born in 1969).

[8] *See* doc. no. 26 (defendant's evidentiary submissions), Ex. I (Arrest Warrant for Philip Payton) ("Arrest Warrant").

[9] *See* doc. no. 26 (defendant's evidentiary submissions), Ex. A (Deposition of Philip Payton) ("Philip Payton Depo."), at 133-136 and 141-142; Ex. E (Affidavit of Chief Rick Singleton) ("Singleton Aff."), at Tabs E-1 (Appearance Bonds dated April 7, 2006) ("Appearance Bonds") and E-2 (Alabama Uniform Arrest Report dated April 7, 2006) ("Arrest Report").

alleged that he had come to her home in a drunken state and destroyed furniture and threatened to kill her and some of her friends.[10]  She told police that Philip's address was 409 County Road 9, Florence, Alabama:  the address of his former girlfriend "Melissa," whose surname is apparently unknown.[11]  Significantly, the County Road 9 address was never verified by the FPD, however, because Kandy did not press charges against Philip.[12]

The FPD maintains pertinent information on individuals who come into contact with police, such as the addresses described above, on software supplied by Spillman Technologies.  The information stored in such electronic media is generally referred to within the FPD as the "Spillman database."[13]  The records are organized primarily by an individual's name, after which that individual's "involvements" with the police are listed by date.[14]  Members of the FPD and/or the Lauderdale County Detention Center also utilize the software to record such things as an individual's physical characteristics, and whether the person is a substance abuser, or known to have possessed any firearms or other weapons, based upon incident/offense reports, arrest

---

[10] *See* doc. no. 26 (defendant's evidentiary submissions), Ex. F (Deposition of Captain Melissa Beasley) ("Beasley Depo."), at 62-67.

[11] *See id.*; Philip Payton Depo. at 48-51.

[12] *See* Beasley Depo. at 66-67.

[13] *See* McCreless Depo. at 33 and 62-63.

[14] *See id.*

reports, and accident reports.[15]

Philip Payton had two identification numbers in the Spillman database based on different spellings of his first name: *i.e.*, "Philip," with one "l" — the proper spelling; and "Phillip," with two "l"s.[16]  Both sets of records cross-reference one another, and they were merged or linked several days after Philip's April 7, 2006 arrest.[17]   The "Philip" main names table references the County Road 9 address supplied by Kandy Payton on September 25, 2006.[18] The "Phillip" main names table references 1618 Northern Boulevard, the address Philip swore under penalty of perjury was correct when he executed his appearance bonds on April 7, 2006.[19] Philip's name was misspelled with two "l"s on the April 7, 2006 arrest paperwork because the officers copied it from the driver's license issued to him by the State of Alabama, which also misspelled his first name.[20]

A Lauderdale County Grand Jury returned an indictment with respect to Philip's April 7, 2006 felony DUI charge on December 5, 2009, and caused an arrest

---

[15] *See id.*; McCreless Depo. at 181.

[16] *See*  Beasley Depo. at 48-70; McCreless Depo. at 61-63, 176, 295; Harless Depo. at 124-129, 163 and 201; *see also* Singleton Aff. at Tabs E-3 (Spillman main names table 62384) ("Spillman Table 62384") and E-4 (Spillman main names table 20386) ("Spillman Table 20386").

[17] *See id.*

[18] *See id.*

[19] *See id.*

[20] *See* Philip Payton Depo. at 133-135; Arrest Report.

warrant to be issued that same day.[21]  The warrant indicates that the document was forwarded to the Lauderdale County Drug Task Force ("DTF") the following day, December 6, 2006.[22]

The DTF scheduled a "round-up" of outstanding arrest warrants for Monday, January 8, 2007.[23]  The warrants were to be served by Florence Police Officers who volunteered for overtime pay by participating in the "round-up."[24]  DTF personnel prepared a packet for each warrant, enclosing background information on the person to be arrested in a manila envelope.[25]  In a typical case, the background information consisted of a printout of the main names table from the Spillman database, any photos of the arrestee, and a printout of the information obtained from the Law Enforcement Tactical System ("LETS") database maintained by the Alabama Criminal Justice Information Center.[26]  The LETS data is, in turn, obtained from the Alabama Department of Public Safety's database of information on an individual's driver's license.[27]

The packet prepared for use in connection with the service of Philip Payton's

---

[21] *See* Harless Depo. at 53-54; Arrest Warrant.

[22] *See  id.*

[23] *See* McCreless Depo. at 9-15.

[24] *See id.*

[25] *See* McCreless Depo. at 17; Harless Depo. at 48-54.

[26] *See id.*

[27] *See* McCreless Depo. at 173.

arrest warrant contained a copy of the warrant itself, a printout from LETS dated December 19, 2006 (containing, among other things, a copy of Philip's driver's license photograph), and two main names tables from the Spillman database dated December 28, 2006: one reflecting the name "Philip" Payton, and the other reflecting the *alias* "Phillip" Payton.[28]  As noted previously, the warrant itself reflected Philip's residential address as 1618 Northern Boulevard.  The LETS printout also stated that his residential address was 1618 Northern Boulevard.[29]  The Spillman printout containing the double "l" spelling of his first name also reflected the same address.[30]  Only the Spillman main names table with the single "l" spelling of "Philip" contained the County Road 9 address that had been provided to police by Kandy Payton on September 25, 2006.  It is interesting to note, however, that the Spillman data sheet for "Philip" also referenced 1618 Northern Boulevard as being both a prior address for Philip Payton, and an address for his father, Jerry Payton.[31]

**B.      Attempted Service of the Felony Warrant on Philip Payton**

Defendants Ricky McCreless and Drew Harless volunteered for the DTF

---

[28] *See* Harless Depo. at 200; Spillman Table 62384; Spillman Table 20386; Singleton Aff. at Tab E-5 (printout on Phillip Payton from LETS database) ("LETS Printout").

[29] *See* LETS Printout.

[30] McCreless Depo. at 180; Spillman Table 62384.

[31] Spillman Table 20386.

8

warrant "round-up" conducted on January 8, 2007.[32]  Early that morning, the officers

attended a briefing at which warrant packets were distributed.[33]  They rode together

in McCreless's marked patrol unit, and both wore standard patrol duty uniforms.[34]

As McCreless drove, Harless reviewed the information in the warrant packet,

including the warrant itself and the information obtained from the Spillman and LETS

databases.  Harless concluded that 1618 Northern Boulevard was a good address.[35]

Both officers had received training on the legal principles governing service

of arrest warrants at the police academy, and kept abreast of changes in the law by

reviewing a "Search and Seizure Bulletin" distributed at roll call, as well as other

instructional training.[36]  At deposition, each officer testified that his understanding

of the law on the date of the events forming the basis of this action was that police

officers could enter a dwelling without consent to serve an arrest warrant if they

possessed a reasonable belief that the arrestee lived there and was inside the

residence.[37]  They were also aware that they had only the right to search areas where

an arrestee might reasonably be hiding, and that any use of force in conjunction with

---

[32] McCreless Depo. at 9-14.

[33] *Id.*

[34] *Id.* at 22.

[35] McCreless Depo. at 152 and 295; Harless Depo. at 20 and 117.

[36] McCreless Depo. at 27-30 and 278-279; Harless Depo. at 73-74.

[37] McCreless Depo. at 30; Harless Depo. at 121.

an arrest must be objectively reasonable under the circumstances.[38]

Officer McCreless parked his patrol unit at the end of the driveway to 1618 Northern Boulevard at approximately 7:45 a.m.[39]  In keeping with their standard practice, McCreless walked to the front door and rang the bell, while Harless walked around the side of the house to make sure the arrestee did not escape through a rear exit.[40]

Officer McCreless's patrol unit was equipped with an audio/visual recording system controlled by a slide switch located in his shirt pocket.[41]  On this occasion, however, McCreless either forgot or neglected to activate the switch upon exiting his vehicle.[42]  He remembered to do so while still outside the house, however, and slid the switch on.  Because of a slight delay in the activation of the recording equipment, only the events that transpired inside 1618 Northern Boulevard were recorded.[43]

No one answered the front door when McCreless rang the bell, but as Officer Harless was walking past the carport, a side door opened, and plaintiff stepped out.[44]

---

[38] McCreless Depo. at 277 and 287.

[39] *Id.* at 40 and 53.

[40] *Id.* at 58; Harless Depo. at 5.

[41] *See* McCreless Depo. at 30-32.  In accordance with departmental policy, McCreless typically records all traffic stops and similar interactions using the A/V equipment. *Id.* at 114.

[42] *Id.* at 98-99.

[43] *Id.* at 98-99 and 240.

[44] Harless Depo. at 5; McCreless Depo. at 87; Plaintiff Depo. at 167-168.

Officer McCreless approached the carport as soon as he heard the side door open.[45]

Officer Harless informed plaintiff that he had a felony arrest for Philip Payton, but

plaintiff, in a tone of voice that Officer Harless described as a loud and belligerent,

informed the officers that Philip either "isn't home" or "didn't live there," and that

he was "out of town."[46]  Plaintiff admits she might have raised her voice, but denies

yelling or becoming belligerent prior to the officers' entry into her home.[47]

Although none of the controverted facts are material, the events that next

occurred are in some dispute.  Officer Harless testified that he was holding the

warrant unfolded in his left hand and attempted to explain to plaintiff what it was, and

why the officers were there.[48]  According to Officer Harless, plaintiff was extremely

emotional and refused to take the warrant from him or read it.[49]  Plaintiff admits that

she recognized Officers McCreless and Harless as policemen, and that one of them

said he had an arrest warrant for her son, but she claims that the piece of paper in the

---

[45] McCreless Depo. at 87; Plaintiff Depo. at 174.

[46] *See* Harless Depo. at 18 ("He's not home," or "He doesn't live here[.]"); McCreless Depo. at 121 ("She said, 'He wasn't there, that he was out of town.'"); Plaintiff Depo. at 175 (where plaintiff testified that she denied her son lived in her home, "[a]nd then I think I said, 'He's out of town.' . . ."). *See also* doc. no. 26 (defendant's evidentiary submissions), Ex. J (Affidavit of Drew Harless) ("Harless Aff."), ¶ 3; and Ex. C (Deposition of Jerry Payton) ("Jerry Payton Depo."), at 147.

[47] Doc. no. 30 (plaintiff's evidentiary submission), Ex. 1 (Declaration of Patsy Payton) ("Plaintiff Decl."), ¶ 2.

[48] Harless Depo. at 5, 22-23, and 92; McCreless Depo. at 65 and 86.

[49] Harless Depo. at 22-23.

officer's hand was blank on both sides.[50]  Plaintiff further maintains she would have allowed the officers to enter her house had she read the warrant.[51]

Plaintiff's immediate belligerence (as perceived by the officers) and conflicting statements about her son "not being home" or "out of town" on the one hand, while on the other hand saying that he "didn't live there," made the officers suspicious that Philip might be hiding inside.[52]  Rather than continue to argue with plaintiff, therefore, Officer Harless stepped past her and entered the house, because he believed plaintiff was using a stalling tactic to give Philip time to either escape or arm himself.[53]

Plaintiff contends that Harless pulled her out of the way, while Harless testified that if he touched Plaintiff at all, it was merely "grazing" her as he stepped past.[54]  In any event, as Harless stepped past plaintiff, McCreless observed plaintiff hold out her arms in an apparent attempt to grab Harless from behind.[55]  McCreless grasped plaintiff's left arm and spun her around, pressing her against a pickup in the carport, and holding her arm behind her back.[56]  At some point during the maneuver,

---

[50] Plaintiff Depo. at 173-176 and 206-207.

[51] *See id.* at 178 and 250.

[52] McCreless Depo. at 150, 164-165, 203 and 211.

[53] *Id.* at 300; Harless Depo. at 30; Harless Aff. ¶ 3.

[54] Plaintiff Depo. at 183; Harless Depo. at 13.

[55] McCreless Depo. at 92-93 and 103.

[56] *Id.* at 92-94, 100, and 107; Plaintiff Depo. at 184-188.

McCreless twisted plaintiff's left thumb.[57]   When she complained, plaintiff claims that McCreless "twisted my thumb up even more."[58]   Because Harless's back was turned, he did not witness McCreless's restraint of plaintiff.[59]   Plaintiff denies making any aggressive movements toward either officer.[60]

When Harless stepped into the house, plaintiff's pug, "Barlow," ran onto the carport through the open door.[61]   Plaintiff told Officer McCreless that her shoulder was hurting, and asked him to release her, so she could stop her dog from running into the street because he was a house pet and had never been outside without being restrained by a leash.[62]   Officer McCreless released plaintiff and asked her to retrieve the dog and then have a seat in a lawn chair in the carport.[63]   Plaintiff picked up the dog, but rather than taking a seat as instructed, she followed McCreless into the house.[64]   Altogether, plaintiff was restrained for less than ten seconds.[65]

The audio from the officers' encounter with plaintiff and her husband ("Mr.

---

[57] McCreless Depo. at 108 and 281.

[58] Plaintiff Decl. ¶ 3.

[59] Harless Depo. at 24-25.  Plaintiff's mere speculation to the contrary is not sufficient to create a disputed fact. *See* Plaintiff Decl. ¶ 3.

[60] Plaintiff Decl. ¶ 3.

[61] Plaintiff Depo. at 190.

[62] Plaintiff Depo. at 148 and 193-194; McCreless Depo. at 108.

[63] Plaintiff Depo. at 195-197; McCreless Depo. at 108-109.

[64] *Id.*

[65] McCreless Depo. at 108.

Payton") inside their house was captured by the recording device in McCreless's patrol unit.[66]  The recording establishes that plaintiff was emotional, belligerent, and upset after the officers entered the residence.[67]  It further demonstrates that plaintiff told the officers that Philip was "not here" and "out of town."[68]  The audio also confirms that Officer Harless informed both Mr. Payton and plaintiff that they had a warrant for the arrest of their son on a felony charge:

| Mr. Payton: | You don't have a right to come in my house without a warrant. |
| Harless: | We have a warrant sir. |
| McCreless: | *Right there it is . . .* |
| *   *   *   * | |
| Harless: | We have a felony warrant for his arrest . . . |
| *   *   *   * | |
| McCreless: | I can pat you down if I want to.  I can pat any of y'all down that I want to.  Um hum, I certainly can - and rightfully so. |
| Mr. Payton: | Without that warrant you can't. |

---

[66] *Id.* at 98-99 and 240.  *See also* doc. no. 26 (defendant's evidentiary submissions), Ex. K (Affidavit of Ricky McCreless) ("McCreless Aff."), at Tab K-1 (transcript of the recording, as authenticated by Officer McCreless) ("Transcript"); and doc. no. 27 (a copy, in DVD format, of the audio and video recording made by the recording equipment in McCreless's patrol vehicle) ("DVD").

[67] *See* Transcript and DVD.

[68] *Id.*

14

| McCreless: | Yes, sir. |
| Mr. Payton: | Without that warrant . . . |
| [Plaintiff]: | *No, it's only a warrant on the boy, not our house.* |
| Mr. Payton: | *It's our address.*[69] |

While McCreless engaged Mr. Payton in a conversation, Harless conducted a quick search of the premises.[70] After shining his flashlight into the bedrooms, Harless saw only one unmade bed and no immediate sign of Philip. Because this cursory search revealed no sign of Philip, and also because they feared the situation might escalate if they stayed longer, the officers decided to leave the premises.[71]

After the officers departed, plaintiff also left and drove to her place of employment. Plaintiff did not seek medical treatment until two days after the incident, when she saw Dr. John Murphy and complained of pain in her left wrist and hand.[72] After suffering many months of severe pain, plaintiff eventually underwent

---

[69] Transcript (emphasis added). *See also* DVD.

[70] McCreless Depo. at 269.

[71] *Id.* at 270; Harless Depo. at 185-188; Jerry Payton Depo. at 115. The officer's fear turned out to be well founded. At deposition, Jerry Payton testified that he keeps at least two loaded guns in his bedroom and, had he grabbed one of his weapons, he would not have "backed down," which would have resulted in a "bad scenario" for the officers in his house. Jerry Payton Depo. at 82-83 and 91-92.

[72] Plaintiff Depo. at 216 (plaintiff testified she went to work after the officers left); doc. no. 26 (defendant's evidentiary submissions), Ex. L (Deposition of Dr. Lloyd Johnson, III) ("Johnson Depo."), at 10.

a day surgical procedure known as a "de Quervain's release," which relieved pressure on a tendon in her left thumb.[73]   Plaintiff missed two weeks from work, but returned with no restrictions or impairment rating.[74]   Dr. Johnson's total charges for the procedure and follow up were approximately $600.[75]   Plaintiff claims that she still has problems with her thumb.[76]

## III.  DISCUSSION

### A.      Plaintiff's § 1983 Claims

Plaintiff, Patsy Payton, voluntarily agreed to the dismissal of her federal claims against the City of Florence.[77]   Her claims against Officers Harless and McCreless for an alleged unlawful search (count I) and excessive force (count III) turn upon the question of whether they are entitled to "qualified immunity."   Qualified immunity is an affirmative defense that provides complete protection for governmental officials whose discretionary acts violate "no clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   The public policy purpose undergirding the defense is that of allowing public officials to perform discretionary functions without the fear of

---

[73] Johnson Depo. at 15, 25, and 36-37; Plaintiff Depo. at 272-72, 279, 284, and 286-87.

[74] Johnson Depo. at 42-43 and 46.

[75] *Id.* at 40.

[76] Plaintiff Depo. at 272-72, 279, 284, and 286-87.

[77] *See* doc. no. 32 (plaintiff's response).

16

personal liability or harassing litigation.  *See*, *e.g.*, *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).  In order to be entitled to this immunity from suit and damages, "the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.  If the defendant was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity."  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citations and internal quotation marks omitted).  Plaintiff does not dispute that both of the individual defendants were acting within the scope of their discretionary authority.  Consequently, the burden shifts to plaintiff to demonstrate that qualified immunity is not appropriate by showing the deprivation of a federal constitutional or statutory right that was clearly established at the time of the official's action.  *See*, *e.g.*, *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991).

The Supreme Court prescribed a two-part analytical-framework for determining whether a public official is entitled to the protections of qualified immunity in *Saucier v. Katz*, 533 U.S. 194 (2001);[78] *see also*, *e.g.*, *Lewis v. City of West Palm*

---

[78] The Supreme Court recently relieved lower courts from mandatory adherence to the order of the two-part *Saucier* test. *See Pearson v. Callahan*, — U.S. —, 129 S. Ct. 808, 818 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").  Even so, under the circumstances of this case, in which the initial issue in dispute is the question of whether there is a Constitutional basis for plaintiff's claim, the analytical sequence recommended in *Saucier* will be

*Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009) (recognizing that this Circuit generally follows *Saucier's* two-part test when "analyzing the applicability of qualified immunity").  Under that test, the "threshold question" that must be asked is whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the officer's conduct violated a constitutional right?"  *Saucier* at 201.  If that question is answered affirmatively, the court may proceed to determine whether that right was "clearly established" at the time of the violation.  *Id.*

## 1.    Plaintiff's Fourth Amendment unlawful-search claim

Plaintiff contends that Officers Harless and McCreless unlawfully entered her home in violation of the Fourth and Fourteenth Amendments.  The Eleventh Circuit, based on the Supreme Court's decision in *Payton v. New York*, 445 U.S. 573 (1980), requires a two-part inquiry to determine if entry pursuant to an arrest warrant complies with the Fourth Amendment's proscription of unreasonable searches and seizures.  First, there must be a reasonable belief that the location to be searched is the suspect's dwelling; and second, the police must have reason to believe that the suspect is within the dwelling.  *See, e.g.*, *United States v. Bervaldi*, 226 F.3d 1256, 1263 (11th Cir. 2000); *United States v. Magluta*, 44 F.3d 1530, 1533 (11th Cir. 1995).  Thus, "for law enforcement officials to enter a residence to execute an arrest warrant

───────────────────────────────

followed.

18

for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, *when viewed in the totality*, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry." *Magluta* at 1535 (emphasis supplied). Furthermore, "in evaluating this on the spot determination . . . courts must be sensitive to common sense factors." *Id.*

In practice, courts tend to examine whether the officers executing the warrant have additional corroborating evidence, beyond the face of the warrant itself, establishing that the address in question is the dwelling of the suspect. *Compare United States v. Bennett*, 555 F.3d 962, 965 (11th Cir. 2009) (noting the possibility of having multiple dwellings and finding that the officers reasonably believed that the suspect resided with his mother when he had recently delivered the rent to the landlord, answered the apartment door when the landlord knocked, and when his mother informed the landlord that he was "in and out"); *Bervaldi*, 226 F.3d 1256 (finding reasonable belief, even though the address in question differed from the address on the warrant and driver's license, because the suspect had previously identified it as his address and had been observed leaving the address in question in a vehicle registered to a third party at that address); *and United States v. Jean*, 315 Fed. Appx. 907 (11th Cir. 2009) (finding reasonable belief when the address was

obtained from a third party, the address matched the address listed for the suspect at the time of a previous police booking, and the telephone number of the suspect matched the number of the apartment); *with Wagner v. Bonner*, 621 F.2d 675 (5th Cir. 1980) (finding no reasonable belief when the officers relied on the warrant address alone, while knowing that warrant addresses in that jurisdiction were wrong 20 to 25% of the time, and entered the house in the middle of the night over the protest of the owner who said the suspect did not reside there).[79]

Based on the evidence, the court finds that the officers reasonably believed that 1618 Northern Boulevard was Philip's dwelling.[80]  The officers' belief was based on two things: the contents of the warrant packet, and the reaction of plaintiff when they approached the house.  In addition to the warrant itself, the packet contained printouts from two different law-enforcement databases, Spillman and LETS, listing 1618 Northern Boulevard as Philip's address.  The address listed on the LETS printout was derived from and matched the address on Philip's driver's license.  Moreover, the officers knew that the address on the warrant matched the address obtained from Philip when he was originally arrested.

---

[79] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

[80] Plaintiff fails to make any distinction between the two officers regarding each one's individual knowledge or reasonable belief.  Consequently, the court will assume that the knowledge of each officer is attributable to the other.

Plaintiff argues that the officers could not reasonably rely on the 1618 Northern Boulevard address for two reasons: it was nine months old, and one of the Spillman database printouts contained a different, more recent address for Philip.[81]  Regarding the nine-month gap between the provision of the 1618 Northern Boulevard address by Philip and the attempted execution of the warrant, the court is not prepared to conclude as a matter of law that such a gap so eroded the reliability of the address that no officer would rely upon it.  *See Bervaldi*, 226 F.3d at 1266 (concluding that the passage of time alone did not erode the reasonable belief that the suspect resided at the address in question).  Regarding the second address, subsequent discovery has revealed that it was provided to the FPD more recently than the 1618 Northern Boulevard address; yet, the warrant packet failed to clearly identify either the source *or age* of the second address.[82]  Thus, a reasonable officer could have discounted it in light of the fact that the age and source of the address were unknown, and all other

---

[81] Plaintiff also argues that the officers' belief was unreasonable because they knew that 1618 Northern Boulevard belonged to Philip's parents.  The court finds this argument unconvincing. Officers are not required to discount an address simply because a suspect's parents might also live in the same home.  Although most adult children do not live with their parents, believing that an adult might live with his parents is not unreasonable.

[82] Plaintiff argues that because the Spillman printout listing the second address, also listed a more recent police "involvement" relating to Philip, the officers knew that the second address was derived from that more recent involvement.  Plaintiff, however, has failed to demonstrate that the officers knew that the address was derived from the more recent police involvement and, thus, more recent than the 1618 Northern Boulevard address.  Subsequent discovery made clear that the second address was, in fact, derived from the more recent police involvement, but that the address belonged to Philip's ex-girlfriend and was provided by Philip's estranged wife, not Philip, and that Philip did not dwell at that address on the date the officers attempted to execute the arrest warrant.

21

documentation in the warrant packet referenced the 1618 Northern Boulevard address. Moreover, even if the officers were aware of the source and age of the second address, they reasonably could have discounted it because the source of the second address was Philip's estranged wife.

Furthermore, the events that transpired outside plaintiff's residence reasonably could be construed to support the officers' belief that the home was Philip's dwelling. When plaintiff was confronted, her reaction was emotional and perceived to be belligerent, and her statement that Philip was "out of town" was construed as a delaying tactic intended to provide Philip an opportunity to either escape or arm himself.[83] Even though plaintiff also informed the officers that Philip did not live at that address, this fact does not render the officers' belief unreasonable. For one thing, plaintiff claimed both that Philip was out of town and that he did not live at that location. Although these statements are not necessarily contradictory, they easily could be viewed as such and interpreted by an officer to be the result of a mother searching for the most believable cover story to promulgate as misinformation intended to delay the officers. Additionally, it is perfectly reasonable to believe that a mother might attempt to mislead police officers about her son's residence to protect him. *See United States v. Jean*, 315 Fed. Appx. 907, 910 (11th Cir. 2009) (noting that

---

[83] Plaintiff denies that she responded belligerently, but the important inquiry is how her response was *perceived* by the officers.

officers could have reasonably believed a mother to be protecting her son by stating that he did not live in the apartment when they had strong evidence to the contrary). This was not a perfect stranger informing the officers that they were at the wrong house.   As perceived by the officers, this was Philip's own mother reacting emotionally to their execution of an arrest warrant for her son, and attempting to help her son.   The fact that the officers' interpretation of plaintiff's actions ultimately proved incorrect does not make it unreasonable under circumstances in which the officers were required to make a split-second determination of whether to enter the home over plaintiff's objections.

In addition, the officers had a reasonable basis for believing that Philip was present in his parents' home.   The Eleventh Circuit has indicted — albeit in an unpublished opinion — that it is safe to assume a suspect is inside a dwelling during an early morning raid, absent conflicting information regarding the suspect's schedule. *See Jean*, 315 Fed. Appx. at 911. It is undisputed in the present case that the defendant police officers were attempting to serve the warrant at approximately 7:45 a.m., and plaintiff has failed to provide any rebuttal to the officers' argument that such an attempt is properly characterized as an "early morning raid."

Even if this court's analysis of the first stage of qualified immunity analysis is incorrect, however, and the officers' actions were deemed to have been unreasonable

and unconstitutional, plaintiff still has failed to demonstrate that such a violation was clearly established by preexisting law.  "For a constitutional right to be clearly established the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Bates v. Harvey*, 518 F.3d 1233, 1247-48 (11th Cir. 2008) (internal quotation marks and citation omitted).

The law may provide an officer "fair and clear notice" that his conduct is unconstitutional in three ways.  First, the case may be one of "obvious clarity," meaning that the officer's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [him], notwithstanding the lack of fact-specific case law." *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir. 2002) (alteration in original) (quoting citation and quotation marks omitted).  "Second, if the conduct is not so egregious as to violate . . . the Fourth Amendment on its face," the court turns to case law, searching for broad statements of principle indicating that particular categories of conduct are unconstitutional, but without linking that conduct to a specific set of facts. *Id.* at 1351.  And finally, in the absence of case law determining that particular types of conduct are unconstitutional, courts "then look at precedent *that is tied to the facts*." *Id.* (emphasis in original).

24

Plaintiff failed to direct the court to any case law from the Supreme Court, the Eleventh Circuit, or the Alabama Supreme Court clearly establishing that entry into a residence based on the circumstances of this case constitutes an unlawful entry under the Fourth Amendment. The question then boils down to this: would it be clear to every reasonable officer, even in the absence of case law, that the entry was unreasonable under the circumstances?

The court concludes that the entry was not so obviously unreasonable that any reasonable officer would have recognized that his actions were unlawful. The officers entered with an arrest warrant and relied on the address provided by the suspect as his home address, which was listed on the warrant, and matched the address obtained from the driver's license of the suspect. When they arrived at the home, the officers were confronted by what they perceived to be an emotional mother searching for a means of protecting her son from arrest.

Neither the fact that there was a second address of unknown age and origin in the warrant packet, nor the fact that the suspect's mother claimed that her son did not live at that address, and also was out of town, is sufficient to make the officers' entry obviously unlawful. Plaintiff failed to prove that no reasonable officer would have discounted the second address, and relied on the address provided by the suspect at the time of his arrest and on his driver's license. Likewise, plaintiff failed to

25

demonstrate that no reasonable officer would have been skeptical of plaintiff's statements and ultimately concluded that she was attempting to protect her son by misleading or delaying the officers. *See Jean*, 315 Fed. Appx. at 910 (indicating that an officer could reasonably believe that a mother might protect her son by lying about his residence). Finally, because "[r]esidency in a house . . . generally is not transitory or ephemeral, but instead endures for some length of time," a nine-month lapse between the date the address was provided by Philip Payton and the date the defendants entered his parents' home does not render the address obviously stale and unreliable. *Bervaldi*, 226 F.3d at 1265.

In light of the foregoing, the court concludes that the officers' entry was not unconstitutional, and that even if it were unconstitutional, the unconstitutionality of the entry was not clearly established. Consequently, the officers are entitled to qualified immunity as to plaintiff's unlawful search claim.

### 2.   Plaintiff's Fourth Amendment excessive-force claim

Plaintiff contends that Officer McCreless employed excessive force in violation of the Fourth and Fourteenth Amendments by twisting her thumb and arm behind her back. The Supreme Court has held, however, that "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Moreover, "[t]he

26

calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id*. at 396-97.  For those reasons, a claim of excessive force is analyzed under the Forth Amendment's "objective reasonableness" standard.  *Id.* at 388.

> In order to determine whether the use of force is "objectively reasonable," we carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake" under the facts of the particular case. [*Graham*, 490 U.S.] at 396, 109 S. Ct. 1865 (internal citations and quotations omitted). We measure the quantum of force employed against these factors — the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight. *Lee* [*v. Ferraro*], 284 F.3d [1188, 1197-98 (11th Cir. 2002)].

*Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009) (alterations supplied).

Further, the application of *de minimis* force, without more, will not support a claim for excessive force in violation of the Fourth Amendment.  *See Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000); *see also Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997) (qualified immunity applied where officers "slammed" plaintiff against wall, kicked his legs apart, and required him to lift his arms above his head, causing pain because of a prior stroke); *Post v. City of Ft. Lauderdale*, 7

27

F.3d 1552, 1560 (11th Cir. 1993) (qualified immunity applied where officer put plaintiff into a choke-hold and pushed him into a wall).

The evidence in this case shows that Officer McCreless believed that plaintiff was attempting to grab Officer Harless from behind, after Harless pushed past her. In response, Officer McCreless restrained plaintiff by twisting her left arm behind her back and pressing her against a vehicle. During the performance of that maneuver, McCreless twisted plaintiff's thumb. Plaintiff claims that he twisted harder when she complained. However, when plaintiff asked to be released, to retrieve her dog, Officer McCreless did so. Altogether, plaintiff was retrained for less than ten seconds.

As a preliminary matter, the court concludes that Officer McCreless's attempted arrest or restraint of plaintiff was arguably supported by probable cause, based on his perception of plaintiff's conduct.[84]  *Durruthy v. Pastor*, 351 F.3d 1080, 1089 (11th Cir. 2003) ("Arguable probable cause exists when an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed."). Officer Harless pushed past plaintiff into her house. Officer McCreless interpreted plaintiff's reaction to be an attempt to grab Harless. Plaintiff claims McCreless was mistaken: *i.e.*, that she had no such intention. Under the doctrine of

---

[84] Plaintiff does not make a false-arrest claim, but the issue must be addressed in at least a cursory fashion because the lawfulness of the arrest or detention impacts the amount of force that could be used. Because no false-arrest claim was made, however, the court need not determine whether Officer McCreless's actions amounted to an arrest or some other lesser form of detainment.

28

arguable probable cause, however, an officer is allowed to make a reasonable mistake.    Strangely, plaintiff failed to address the reasonableness of Officer McCreless's mistaken actions.  Under circumstances requiring an immediate decision to diffuse a potentially dangerous situation, McCreless's decision, based on his perception, though mistaken, was reasonable and supported by arguable probable cause.

Moreover, the court also concludes that the force used to restrain plaintiff was *de minimis*.  The officer did not strike, kick, shock with a taser, or shoot plaintiff. Instead, the officer merely twisted plaintiff's arm, and pressed her against a vehicle for less than ten seconds.    Plaintiff failed to direct the court to a single case supporting the proposition that the force used was more than *de minimis*, and excessive under these circumstances.  The court generally will not give consideration to arguments that are not fully developed or bolstered with legal authority.  *See*, *e.g*., *United States Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (refusing to address a party's "perfunctory and underdeveloped argument") (citing *Flanigan's Enterprises, Inc. v. Fulton County*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that "fail[ure] to elaborate or provide any citation of authority in support [of an argument]" results in waiver)).

Furthermore, because Officer McCreless did not violate plaintiff's rights,

Officer Harless was under no duty to intervene.  Eleventh Circuit case law makes clear that there must be an underlying constitutional violation requiring intervention before a duty to intervene will arise.  *See Crenshaw v. Lister*, 556 F.3d 1283, 1294 (11th Cir. 2009) (holding that the "failure to intervene" claim against the second officer must fail because the first officer did not commit a constitutional violation); *Sanders v. City of Union Springs*, 207 Fed. Appx. 960, 966 (11th Cir. 2006) ("[G]iven that the plaintiffs are unable to establish a constitutional violation, their claim for failure to intervene must fail.").

Because the evidence does not support a claim that the force used was excessive, the court need not proceed to the second stage of the qualified immunity analysis, *i.e.*, whether defendants violated clearly established law.  *See Zivojinovich v. Barner,* 525 F.3d 1059, 1072-73 (11th Cir. 2008) ("Because we conclude that there was no . . . violation, we need not address the second prong of the qualified immunity analysis.").  Defendants are entitled to qualified immunity as to plaintiff's excessive-force claim.

## B.   State Law Claims

In cases such as this one, in which the court's jurisdiction is based solely upon federal questions, the district court has discretion to entertain state claims that are

supplemental to the federal claim.  *See* 28 U.S.C. § 1367(a).[85]  Even so, Congress

permits district courts to decline to exercise such supplemental jurisdiction in several

circumstances:

> (1)   the claim raises a novel or complex issue of State law,
>
> (2)   the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3)   the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4)   in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  The Supreme Court added a gloss to this statutory language in

*Carnegie-Mellon University v. Cohill*, 484 U.S. 343 (1988), when observing that

> a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendant [now "supplemental"] state-law claims.  When the balance of these factors indicates that a case properly belongs in state court, *as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain*, the federal court *should decline* the

---

[85] 28 U.S.C. § 1367(a) provides that:

> (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

31

exercise of jurisdiction by dismissing the case without prejudice.

*Id*. at 349-50 (emphasis supplied) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27 (1966)).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon*, 484 U.S. at 350 n.7; *see also L.A. Draper & Son V. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) (stating that "if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of state claims").

Here, all of the plaintiff's federal claims will be dismissed pursuant to defendant's motion for summary judgment.  Accordingly, this court exercises its discretion to dismiss plaintiff's state-law claims.

## IV.  CONCLUSION AND ORDER

In accordance with the foregoing, defendant's motion for summary judgment is GRANTED, and plaintiff's federal claims are dismissed with prejudice.  Plaintiff's state-law claims are dismissed without prejudice.  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

DONE and ORDERED this 30th day of June, 2010.

_____
United States District Judge

33